### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

```
------------------------------ x
KEVIN WINEBRENNER,                :
                                  :
        Plaintiff,                :
                                  :
                                  :
v.                                :   Civil No. 3:24-CV-1261 (AWT)
                                  :
ELIZABETH IVES SCHOOL FOR         :
SPECIAL CHILDREN, INC.,           :
                                  :
        Defendant.                :
------------------------------ x
```

### RULING ON MOTION TO DISMISS

Plaintiff Kevin Winebrenner brings a one-count Complaint against defendant Elizabeth Ives School for Special Children, Inc. ("Elizabeth Ives School"), claiming a violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a) ("Section 504"). Elizabeth Ives School has moved to dismiss the Complaint, arguing that it is not a recipient of federal funds and therefore is not subject to Section 504. For the reasons set forth below, the motion to dismiss is being denied.

### I.    FACTUAL ALLEGATIONS

Kevin Winebrenner was a Special Education Teacher at Elizabeth Ives School, which is "a private, non-profit, special education therapeutic day school in North Haven, Connecticut." Compl. (ECF No. 1) ¶ 21. In the summer of 2020 he suffered a spinal injury. He alleges that this injury "substantially

limited one or more of his life activities, including but not
limited to working." Id. ¶ 48.

"In March 2021, Winebrenner had surgery to fuse his
cervical vertebrae." Compl. ¶ 53. "After his surgery,
Winebrenner was on medical leave for approximately eight weeks."
Id. ¶ 54. "Winebrenner advised [Elizabeth Ives School Executive
Director Linda] Zunda of his May 3, 2021, appointment with his
doctor to determine when he could return to work." Id. ¶ 57. "On
May 9, Winebrenner advised Zunda that he was not permitted to
return to work until Winebrenner had seen a physical therapist."
Id. ¶ 58. "On May 12, 2021, Zunda sent Winebrenner a text
message asking if he had heard from his doctor regarding his
return to work." Id. ¶ 64. "On May 19, 2021, Zunda sent
Winebrenner a text message advising him that she received his
doctor's specific restrictions." Id. ¶ 76. "Zunda told
Winebrenner that Elizabeth Ives School could not have him back
to work with his restrictions." Id. ¶ 77.

"Winebrenner's doctor advised Elizabeth Ives School that
Winebrenner was not permitted to lift greater than fifteen
pounds and should not be working one-on-one with physically
combative students." Id. ¶ 78. "As part of Winebrenner's duties,
Winebrenner and a teacher's aide taught classes of four
students." Id. ¶ 79. "Elizabeth Ives School students had the
potential to be physically aggressive as a result of

disabilities, including mood disorders." Id. ¶ 80. "Zunda advised that the school could not have Winebrenner back with the conditions." Id. ¶ 82. "Zunda told Winebrenner that she would need to hire someone new." Id. ¶ 83.

"On May 20, 2021, Winebrenner replied, stating that he understood Zunda's decision and that he knew his condition would improve within the next two weeks." Id. ¶ 84. "Winebrenner told Zunda that he was hoping to be off of light-duty in time for the summer session." Id. ¶ 85. "Zunda replied and told Winebrenner that if she hired a new teacher, that she would not have a place for Winebrenner." Id. ¶ 86. "Zunda told Winebrenner that she felt awful about the situation, believed that it would be ideal for Winebrenner to work with less volatile students, and would be happy to write a letter regarding his wonderful relationships with students." Id. ¶ 87.

"Winebrenner was terminated on May 20, 2021." Id. ¶ 88. "Elizabeth Ives School's stated reason for termination was their inability to provide Winebrenner with an accommodation for his disability." Id. ¶ 89. Winebrenner alleges that "Elizabeth Ives [School] was capable of offering Winebrenner light-duty consistent with his doctor's instructions without undue burden," id. ¶ 90, and that he was fired because he "requested a reasonable accommodation which would cause no undue burden to Elizabeth Ives School," id. ¶ 108.

-3-

Winebrenner alleges that Elizabeth Ives is a recipient of federal funding for two reasons.

First, Winebrenner alleges that Elizabeth Ives accepts federal funds through Part B of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq. "IDEA Part B grants the Connecticut State Department of Education ('CSDE') allocations to be used to assist local education agencies ('LEAs') in the excess costs of providing specialized education and related services to children with disabilities." Id. ¶ 9. "IDEA Part B permits CSDE to sub-grant IDEA Part B funds to LEAs in order to provide tuition for students publicly placed in private schools to meet their unique needs." Id. ¶ 10. "IDEA is designed to improve educational results for all children with disabilities, providing benefits and services to children with disabilities in public schools, and also required LEAs to make services and benefits available to children with disabilities enrolled by their parents in nonpublic (private) schools to ensure equitable participation in receiving an education." Id. ¶ 11. "School districts receiving IDEA Part B funding must expend a proportionate amount of funding for the benefit of eligible students who had FAPE made available to them and whose parents elected to place them in private schools." Id. ¶ 12.

"A private special education program must apply with the

-4-

CSDE Bureau of Special Education ("BSE") to be considered an
Approved Private Special Education Program ("APSEP.")[.]" Id.
¶ 16. "APSEPs are eligible for grants and/or funding from CSDE
BSE's IDEA Part B entitlement." Id. ¶ 17. "As part of its
approval and review process, in part the BSE conducts site
visits, reviews education files of students, reviews personnel
files, and the special education program's application to become
an APSEP." Id. ¶ 18. "As part of its approval process, the BSE
requires private facilities to have written policies to ensure
compliance with Section 504 of the Rehabilitation Act of 1973
and other federal requirements." Id. ¶ 19. "Elizabeth Ives
School is an APSEP." Id. ¶ 24. "The majority of the referrals
that Elizabeth Ives School receives come from the local public
school systems in South Central Connecticut." Id. ¶ 25. "The
federal DOE does not directly issue IDEA Part B grants to
individual education programs." Id. ¶ 26. "At all times material
to this Complaint, Elizabeth Ives School received State of
Connecticut and federal funds for educational services and
programs." Id. ¶ 29.

Second, Winebrenner alleges that "Elizabeth Ives School
also received federal financial assistance through a US Small
Business Association Paycheck Protection Program loan of
$114,735.00, approved on April 28, 2020, issued through Webster
National Bank Association, and reported as a loan status of Paid

in Full or Forgiven in April 2021." Id. ¶ 31.

Paragraph 28 of the Complaint reads: "LEAs include Elizabeth Ives School." However, in response to the defendant's statement that "Elizabeth Ives is not an LEA and not eligible to receive IDEA Part B funding," Def.'s Br. in Supp. of Mot. to Dismiss (ECF No. 17-1) ("Def.'s Mem."), at 13,[1] the plaintiff states: "Plaintiff does not allege that Defendant is itself an LEA . . . . Rather, Plaintiff contends that Defendant is an Approved Private Special Education Program ("APSEP") that indirectly benefits from IDEA Part B funding through tuition payments facilitated by LEAs, which are the direct recipients of such federal funds." Pl.'s Resp. in Opp. To Def.'s Mot. to Dismiss (ECF No. 20) ("Pl.'s Opp."), at 7–8.

## II.  LEGAL STANDARD

The defendant moves to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. However, a federal court "ha[s] original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. "[A] case arises under federal law when federal law creates the cause of action asserted." Gunn v. Minton, 568 U.S. 251, 257 (2013). The defendant argues that it "is not an entity

---

[1] The page numbers cited to in this ruling for documents that have been electronically filed refer to the page numbers in the header of the documents and not to the page numbers in the original documents, if any.

subject to the federal Rehabilitation Act, 29 U.S.C. § 794(a) because it does not receive federal financial assistance – a basic requirement under the act." Def.'s Mem., at 1. Because a defendant's receipt of federal funds is an element of a Section 504 claim, the court treats the instant motion as one pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss for failure to state a claim.

When deciding a motion to dismiss under Rule 12(b)(6), the court must accept as true all factual allegations in the complaint and must draw inferences in a light most favorable to the plaintiff. See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). Although a complaint "does not need detailed factual allegations, . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citations omitted) (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 557). "Factual allegations must be enough to raise a right to relief above the

speculative level, . . . on the assumption that all the
allegations in the complaint are true (even if doubtful in fact)
. . . ." Twombly, 550 U.S. at 555 (citations and internal
quotations omitted). However, the plaintiff must plead "only
enough facts to state a claim to relief that is plausible on its
face." Id. at 570. "A claim has facial plausibility when the
[claimant] pleads factual content that allows the court to draw
the reasonable inference that the defendant is liable for the
misconduct alleged." Iqbal, 556 U.S. at 678.

"The function of a motion to dismiss is 'merely to assess
the legal feasibility of the complaint, not to assay the weight
of the evidence which might be offered in support thereof.'"
Mytych v. May Dep't Store Co., 34 F. Supp. 2d 130, 131 (D. Conn.
1999) (quoting Ryder Energy Distribution v. Merrill Lynch
Commodities, Inc., 748 F.2d 774, 779 (2d Cir. 1984)). The issue
on a motion to dismiss "is not whether [the] plaintiff will
prevail, but whether [the plaintiff] is entitled to offer
evidence to support his claims." United States v. Yale New Haven
Hosp., 727 F. Supp. 784, 786 (D. Conn. 1990) (citing Scheuer,
416 U.S. at 236).

In its review of a motion to dismiss for failure to state a
claim, the court may consider "only the facts alleged in the
pleadings, documents attached as exhibits or incorporated by
reference in the pleadings and matters of which judicial notice

-8-

may be taken." <u>Samuels v. Air Transp. Local 504</u>, 992 F.2d 12, 15 (2d Cir. 1993).

### III. DISCUSSION

"A prima facie violation of Section 504 requires proof from the plaintiff that '(1) he is a "[disabled] person" under the Rehabilitation Act; (2) he is "otherwise qualified" for the program; (3) he is excluded from benefits solely because of his [disability]; and (4) the program or special service receives federal funding.'" <u>C.L. v. Scarsdale Union Free Sch. Dist.</u>, 744 F.3d 826, 840-41 (2d Cir. 2014) (alterations in original) (quoting <u>Mrs. C. v. Wheaton</u>, 916 F.2d 69, 74 (2d Cir. 1990)).

Section 504 provides: "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any <u>program or activity</u> receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a) (emphasis added). "For the purposes of this section, the term 'program or activity' means all the operations of . . . an entire corporation, partnership, or other private organization, or an entire sole proprietorship . . . which is principally engaged in the business of providing education . . . any part of which is extended Federal financial assistance." <u>Id.</u> §§ 794(b), 794(b)(3)(A), 794(b)(3)(A)(ii), 794(b)(4).

-9-

The regulations promulgated under the Rehabilitation Act define "recipient" as follows:

> Recipient means any State or its political subdivision, any instrumentality of a State or its political subdivision, any public or private agency, institution, organization, or other entity, or any person to which Federal financial assistance is extended directly or through another recipient, including any successor, assignee, or transferee of a recipient, but excluding the ultimate beneficiary of the assistance.

45 C.F.R. § 84.30.

Thus, there are three ways an entity may be a recipient:

> First, the entity may directly request and receive federal financial assistance that is conditioned on Section 504 coverage. Second, the entity may be a "program or activity" of a "department, agency, special purpose district, or other instrumentality of a State or of a local government," "any part of which" receives federal aid. 29 U.S.C. § 794(b). And finally, the entity may indirectly receive federal financial assistance through another entity that requests and receives the Federal financial assistance in the first instance and then extends that money to the non-requesting entity.

T.W. v. New York State Bd. of L. Examiners, 996 F.3d 87, 93 (2d Cir. 2021) (applying Section 504 to determine whether a state entity was a recipient of federal financial assistance and thereby waived its sovereign immunity).

Elizabeth Ives School's sole argument in support of its motion to dismiss is that the Complaint should be dismissed because it is not a recipient of federal funds within the meaning of Section 504.

The plaintiff contends that he "plausibly alleged that Defendant was both an indirect recipient of IDEA funding and a direct beneficiary of federal financial assistance through its PPP loan." Pl.'s Opp., at 5. The court concludes that the plaintiff has plausibly alleged that the defendant was an indirect recipient of federal funding within the meaning of Section 504, but has not plausibly alleged that the defendant was a direct recipient of federal funding within the meaning of Section 504.

### A.    Indirect Recipient of IDEA Funding

In Department of Transportation v. Paralyzed Veterans of America, the Supreme Court stated, "[b]y its terms § 504 limits its coverage to the 'program or activity' that 'receiv[es]' federal financial assistance." 477 U.S. 597, 604 (1986). The Court then explained, "[a]t the outset, therefore, § 504 requires us to identify the recipient of the federal assistance. We look to the terms of the underlying grant statute." Id.

"Congress limited the scope of § 504 to those who actually 'receive' federal financial assistance because it sought to impose § 504 coverage as a form of contractual cost of the recipient's agreement to accept the federal funds." Id. at 605. Thus, in Paralyzed Veterans the Court concluded that "[b]y limiting coverage to recipients, Congress imposes the obligations of § 504 upon those who are in a position to accept

-11-

or reject those obligations as a part of the decision whether or not to 'receive' federal funds." Id. at 606.

In Paralyzed Veterans the Court also explained that the term "recipients within the meaning of § 504" is limited to intended recipients. Id. In rejecting an argument made by the respondents, the Court stated:

> They also find support for their position in Grove City's recognition that federal financial assistance could be either direct or indirect. This argument confuses intended beneficiaries with intended recipients. While we observed in Grove City that there is no "distinction between direct and indirect aid" and that "[t]here is no basis in the statute for the view that only institutions that themselves apply for federal aid or receive checks directly from the Federal Government are subject to regulation," we made these statements in the context of determining whom Congress intended to receive the federal money, and thereby be covered by Title IX. 465 U.S., at 564, 104 S.Ct., at 1217. It was clear in Grove City that Congress' intended recipient was the college, not the individual students to whom the checks were sent from the Government. It was this unusual disbursement pattern of money from the Government through an intermediary (the students) to the intended recipient that caused us to recognize that federal financial assistance could be received indirectly. While Grove City stands for the proposition that Title IX coverage extends to Congress' intended recipient, whether receiving the aid directly or indirectly, it does not stand for the proposition that federal coverage follows the aid past the recipient to those who merely benefit from the aid.

Id. at 606-07.[2]

_____

[2] "Title IX includes the federal funding language identical to that at issue here [in Section 504]. . . . Accordingly, '[t]he Supreme Court has treated this language in Title IX as coextensive with the language in the Rehabilitation Act.'" Tobinworld, 2016 WL 3519244, at *4 (citations omitted). See also Paralyzed Veterans, 477 U.S. at 605 ("Under the program-specific

The Complaint alleges facts which establish that Elizabeth Ives School was an intended recipient of IDEA Part B funding, not merely a beneficiary. The IDEA "provides funds to public school districts for special education and related services." Doe v. League Sch. of Greater Boston, Inc., No. 16-cv-11940-IT, 2017 WL 3594257, at *3 (D. Mass. Aug. 21, 2017). "In certain circumstances the Act 'provides for placement [of special education students] in private schools at public expense' to ensure they receive the free and appropriate public education to which they are entitled." Smith v. Tobinworld, No. 16-cv-01676-RS, 2016 WL 3519244, at *6 (N.D. Cal. June 28, 2016) (quoting Sch. Comm. Of Town of Burlington, Mass. v. Dep't of Educ. of Mass., 471 U.S. 359, 369 (1985)). Under the IDEA:

> [P]rovision is made for the participation of [children placed in private schools by their parents] in the program assisted or carried out under this subchapter by providing for such children special education and related services . . .
>
> Children with disabilities in private schools and facilities are provided special education and related services, in accordance with an individualized education program, at no cost to their parents, if such children are placed in, or referred to, such schools or facilities by the State or appropriate local educational agency as the means of carrying out the provision of special education and related services to all children with disabilities within such State.

---

statutes, Title VI, Title IX, and § 504, Congress enters into an arrangement in the nature of a contract with the recipients of the funds: the recipient's acceptance of the funds triggers coverage under the nondiscrimination provision.").

Doe, 2017 WL 3594257, at *3 (quoting 20 U.S.C.

§§ 1412(a)(10)(A)(i), 1412(a)(10)(B)(i)).

"Congress intended private schools in which disabled

students are placed to receive federal funds. . . . Congress

expressly provided for the allocation and disbursement of

federal funds through state agencies for the purpose of

providing an appropriate education for disabled children placed

in private schools." Id. (citing Town of Burlington, 471 U.S. at

369; 20 U.S.C. § 1412(a)(10)(B)(i)). Doe elaborates on

Congress's intent in providing IDEA Part B funds:

> The grants provided to the School under the IDEA are
> analogous to the Basic Educational Opportunity Grants
> at issue in Grove City College. . . . Similarly here,
> the IDEA earmarked funds for private schools by
> requiring local education agencies to identify,
> locate, and evaluate disabled children who are
> enrolled in private schools by their parents with the
> consent of their local public agency, and to develop
> and implement a practical method for determining which
> of those children are receiving needed special
> education services. 20 U.S.C. §§ 1412(a)(3)(A),
> 1412(a)(10)(i)-(iii). Based on this "child find,"
> federal funds will be granted to the public agency
> proportionally; these funds may not be supplanted by
> state or local funds. Id. §§ 1412(a)(10)(A)(i)(I),
> 1412(a)(10)(A)(i)(IV). For children like [Doe's
> child]--who are placed in a private school by local or
> state education agencies--the payments the public
> agency is required to make to the placement school are
> directly determined by the funding the state receives
> from the federal government under the IDEA. Id.
> § 1412(f)(2)(A). Funds that cannot be used for any
> purpose other than payments to private schools that
> provide special education services to children in
> compliance with the IDEA can only be described as
> "earmarked" for that purpose. Compare with [NCAA], 525
> U.S. at 468, for an explanation that, although the

> NCAA received dues from colleges and universities that received federal funds, it merely benefited from federal funds because they were not "earmarked" for payment of dues to the NCAA. Accordingly, the court finds that Congress intended the School to receive federal funds [via IDEA Part B].

Id. at *4. See also Tobinworld, 2016 WL 3519244, at *6 ("[W]hen a disabled child . . . gets placed in private school on the public dime, that private school--Tobinworld here--is the intended recipient of the federal financial assistance disbursed via the IDEA. True, [the LEA] 'selected,' 'paid for,' and 'coordinated' [the student's] private school placement at Tobinworld, but like the students in Grove City, it served as a 'mere conduit[ ] of the aid to its intended recipient.'" (quoting Paralyzed Veterans, 477 U.S. at 607)).

The Complaint alleges in Paragraph 9 that the Connecticut State Department of Education is granted allocations under IDEA Part B, which it uses to assist Local Education Agencies to pay a portion of the costs of providing specialized education and related services to children with disabilities. It alleges in Paragraph 10 that the Connecticut State Department of Education is permitted under IDEA Part B to make subgrants to Local Education Agencies in order to provide tuition for students publicly placed in private schools. It alleges in Paragraph 16 that an APSEP must apply to the Bureau of Special Education of the Connecticut State Department of Education in order to

-15-

qualify as an APSEP, and that the Elizabeth Ives School is an APSEP. In Paragraphs 25 and 29 the Complaint further alleges that the majority of the referrals received by the Elizabeth Ives School come from local public school systems in South Central Connecticut, and that at all relevant times the defendant received State of Connecticut and federal funds for educational services and programs through this plan for providing an appropriate education for disabled children placed in private schools.

The factual allegations in the Complaint also establish that the Elizabeth Ives School was in a position to accept or reject obligations under Section 504. "The language of the IDEA does not obligate private schools to take children who are referred or placed by public agencies. The [s]chool's ability to choose whether or not to enroll [students] and to accept the tuition payments provided by the state or local education agency indicates its ability to reject federal funds if it so chooses." Doe, 2017 WL 3594257, at *4. "Like Grove City College, [the school] elects to take placements under the IDEA. The acceptance of those students, and the federal funds that support them, carries attendant obligations, one of which is the requirement not to discriminate in violation of section 504 of the Rehabilitation Act." Tobinworld, 2016 WL 3519244, at *6 (citing Paralyzed Veterans, 477 U.S. at 606).

-16-

Paragraph 16 of the Complaint establishes that the Elizabeth Ives School had to take the affirmative step of applying to the Bureau of Special Education before it could be considered an APSEP. The Complaint alleges that the Bureau of Special Education conducted site visits, reviewed education files of students, and reviewed personnel files as part of reviewing Elizabeth Ives School's application to become an APSEP, and the only reasonable inference is that the defendant cooperated with the Bureau in support of its application. In addition, Paragraph 19 of the Complaint establishes that the defendant took the affirmative step of adopting written policies that ensured it was in compliance with Section 504 and other requirements of federal law. Thus, the factual allegations in the Complaint establish that the Elizabeth Ives School took numerous affirmative steps so that its application would be approved by the Bureau of Special Education, and thus, was in a position to accept or reject obligations under Section 504.

Elizabeth Ives School contends, in substance, that as a practical matter it was not in a position to accept or reject obligations under Section 504. It argues:

> Plaintiff's Opposition, similar to the Complaint, merely asserts that it is possible that a Local Education Agency ("LEA") comingled IDEA funding when it made tuition payments to Elizabeth Ives thereby transferring the LEA's obligations under the IDEA and jurisdiction under the Rehabilitation Act to Elizabeth Ives. Yet, practically, the claim [strains] common

-17-

> sense and would force Elizabeth Ives to inquire with
> an LEA before accepting a student and corresponding
> tuition, as to whether any IDEA federal funding was
> comingled in the tuition payment. . . . The only way
> Elizabeth Ives would be in a position to reject
> obligations under the Rehabilitation Act would be by
> denying entry to any student from an LEA which
> receives any federal IDEA funding, an absurd result.

Def.'s Reply in Supp. of Mot. to Dismiss (ECF No. 24) ("Def.'s
Reply"), at 1-2.

However, this argument does not account for the plaintiff's
factual allegations with respect to the defendant applying to
the Bureau of Special Education so that it could be an APSEP;
with respect to the numerous affirmative steps the defendant
took in support of its application, including adopting written
policies that assured it was in compliance with Section 504; and
with respect to APSEPs being eligible for grants or funding from
IDEA Part B funds.

If the defendant is asserting, based on Paragraph 29 of the
Complaint ("At all times material to this Complaint, Elizabeth
Ives School received State of Connecticut and federal funds
. . . ."), that it had no way of knowing whether it was
receiving only funds from the State of Connecticut, only IDEA
Part B funds, or a combination of the two then, drawing
inferences in a light most favorable to the plaintiff, the
Elizabeth Ives School could have advised the Bureau of Special
Education that it did not want to receive IDEA Part B funds when

it applied to be an APSEP. If the defendant is asserting that it never received any IDEA Part B funds, then drawing inferences in a light most favorable to the plaintiff, he has plausibly pled that the defendant was a recipient of federal funds within the meaning of Section 504, and the defendant will have to advance that contention once this action proceeds past the motion to dismiss stage.

**B.    The Defendant's PPP Loan**

The plaintiff contends that the "[d]efendant's receipt of a federal Paycheck Protection Program ("PPP") loan further subjects it to Rehabilitation Act compliance. Defendant was approved for and benefited from a PPP loan of $114,735, which it used to maintain operations during the COVID-19 pandemic." Pl.'s Opp., at 4.

The parties cite conflicting authority with respect to whether receipt of a PPP loan by an entity makes that entity a recipient within the meaning of Section 504. However, there is no need here for the court to address that issue because "§ 504 applies only to . . . those periods during which the [federal] funds are accepted." Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn, 280 F.3d 98, 113 n.2 (2d Cir. 2001). See also T.W., 966 F.3d at 97 (citing Garcia, 280 F.3d at 113 n.2); Koslow v. Pennsylvania, 302 F.3d 161, 166 n.3 (3d Cir. 2002) ("[Section 504] applies only during the periods during which the [federal]

-19-

funds are accepted."). Consequently, in <u>DiPietro v. Archbishop Wood High School</u> the court held: "If the school's PPP loan constituted 'Federal financial assistance,' any 'acceptance' of that assistance ended when the government forgave the loan." 711 F. Supp. 3d 488, 493 (E.D. Pa. 2024) (citing <u>Koslow</u>, 302 F.3d at 166 n.3).

Drawing all reasonable inferences in the plaintiff's favor, the Complaint alleges that the PPP loan was either repaid or forgiven prior to any violation by Elizabeth Ives School of Winebrenner's rights under Section 504. Winebrenner had surgery in March 2021 and was on medical leave for approximately eight weeks. Winebrenner had a May 3, 2021 appointment with his doctor to determine when he could return to work, and on May 9, 2021 he advised Executive Director Linda Zunda that he was not permitted to return to work until he had seen a physical therapist. On May 12, 2021 Zunda sent Winebrenner a text message asking if he had heard from his doctor regarding his return to work. On May 19, Zunda sent a text message advising him that she had received his doctor's specific restrictions and told him that he could not return to work with those restrictions. <u>See</u> Compl. ¶¶ 76–77. After some back and forth concerning the potential physical demands of Winebrenner's position and Winebrenner's timeline for recovery, Elizabeth Ives School terminated Winebrenner's employment on May 20, 2021. <u>See id.</u> ¶¶ 78–89.

Consequently, the plaintiff has not plausibly alleged that the defendant was a direct recipient of federal funding based on the PPP loan.

**IV.  CONCLUSION**

For the reasons set forth above, the defendant's motion to dismiss (ECF No. 17) is hereby DENIED.

It is so ordered.

Dated this 1st day of August 2025, at Hartford, Connecticut.


                         /s/AWT
                 Alvin W. Thompson
        United States District Judge